[Cite as *Danberry Co. v. Nadeau*, 2020-Ohio-5366.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

The Danberry Co.                           Court of Appeals No. L-19-1254

    Appellee                            Trial Court No. CI0201801344

v.

 Teresa Nadeau                            **DECISION AND JUDGMENT**

    Appellant                           Decided:  November 20, 2020

* * * * *

James P. Silk, Jr. and Douglas A. Wilkins, for appellee.

Teresa Nadeau, pro se.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Teresa Nadeau, appeals the October 4, 2019 judgment of the

Lucas County Court of Common Pleas granting summary judgment in favor of appellee,

The Danberry Co. ("Danberry").  For the reasons that follow, we affirm the trial court's

judgment.

## I.  Background

{¶ 2} On September 26, 2017, the parties entered into a listing agreement whereby Danberry was engaged to be the exclusive listing agent for the sale of Nadeau's property located at 920 Bury Road in Oregon, Lucas County, Ohio.  Under that agreement, Danberry had the exclusive right to list Nadeau's property for six months.  The agreement stated that Danberry had the right to sell Nadeau's property for $339,000, "or to sell or exchange it on any other terms or price, which Owner accepts in writing."  The agreement further provides that "[i]f an offer is secured on the above terms or an offer is obtained which [Nadeau] accepts in writing," Nadeau is obligated to pay Danberry a commission of $295 plus 5.76 percent of the purchase price.

{¶ 3} Tom Smith and Chris Hall are agents with Danberry who worked with Nadeau to list her house for sale.  According to Hall, after the listing agreement was signed, the parties agreed to place the sale on hold until repairs from basement flooding were completed.  On November 1, 2017, the house was ready for sale and Smith took photos of Nadeau's house.  The next day, Smith and Nadeau had a meeting, during which they changed the date of the already-executed listing agreement to November 2, 2017, and added handwritten dates to specify that the exclusive six-month listing period would begin on November 2, 2017, and end on May 2, 2018.

{¶ 4} At that same time, the parties signed a "Graduated Commission Addendum to the Listing Agreement," which states that the commission charged on Nadeau's property would be $295 plus 7 percent of the first $150,000 of sale price, 6 percent of any

2.

amount between $150,001 and $200,000, 5 percent of any amount between $200,001 and $250,000, and 4 percent of any amount over $250,000. Nadeau's signature is on the addendum without a date, but the signature on behalf of Danberry—presumably Tom Smith, although it is not very legible—is dated November 2, 2017. The addendum further provides, in handwriting, that the addendum applies to the listing agreement dated "5-2-18." Although there was no listing agreement dated May 2, 2018, the parties had specified that the six-month listing period would expire on May 2, 2018.

{¶ 5} Nadeau, however, disputed that she agreed to the Graduated Commission Addendum, and she claimed that Danberry forged her signature on that document. She also alleged that Danberry fraudulently changed the date of the listing agreement from September 26, 2017, to November 2, 2017. She did not, however, dispute that she entered into the listing agreement with Danberry on September 26, 2017.

{¶ 6} On November 2, 2017, the property became an active listing on the Toledo Regional Association of Realtors Multiple Listing Service.

{¶ 7} On November 15, 2017, Hall presented Nadeau with an offer from Erik and Jill Vidra, non-parties to this appeal, to purchase the property for the asking price of $339,000. Nadeau accepted the offer and she and the Vidras executed a written purchase agreement on November 22, 2017. Per the terms of the purchase agreement, the parties were to close on the property on or before January 15, 2018, and Nadeau was required to give up possession of the property within five days after closing.

3.

{¶ 8} On January 2, 2018, Hall emailed Nadeau.  He reminded her of the approaching closing date, and asked Nadeau to call him to discuss the possibility of escrowing certain repair costs at closing.  In response, Nadeau informed Hall that she was not ready to close because the Dundee, Michigan house that she intended to move into would not be ready until the end of January.  Hall then asked Nadeau what she proposed to do, given that the Vidras were contractually entitled to take possession of the property five days after closing—which, at that point, was the "20th or 21st" of January, given that the buyers had already agreed to a January 16 closing date because January 15 was the Martin Luther King holiday.

{¶ 9} Throughout their subsequent email correspondence, Nadeau expressed her desire to delay turning over possession of the property—stating that she thought that "closing would have to occur at the same time my Dundee home would be ready."  Hall repeatedly reminded Nadeau that the closing date was specified in the contract as January 15, and the closing date could not be changed again unless both parties agreed.  Hall repeatedly asked Nadeau for "something to take back to the purchaser who is expecting possession on the 21st."  Nadeau did not respond to Hall's requests for a proposal that he could take back to the Vidras.

{¶ 10} From the parties' correspondence, it appears that Hall and Nadeau had a phone call on or about January 16, 2018—the rescheduled closing date—after which Hall emailed Nadeau, forwarding all of his previous emails with her, and stated:

4.

Teresa, attached are the emails I sent you trying to get you to give me a date to put on the contract for possession the last several weeks. As I said, I cannot be ambiguous, I must have specific dates. If you want January 31st, I can propose that, but again remember that is a specific date. On our phone call you kept repeating that I did not respond to your request to extend the dates, and I did but I need a specific date. If you still want to close and have possession till [sic] the 31st, I can propose that to the buyers [sic] agent.

{¶ 11} Nadeau did not respond to that email, and the closing did not occur on January 16, 2018, as scheduled.

{¶ 12} According to Hall, Nadeau then attempted to re-negotiate Danberry's commission on January 16, 2018. Hall informed Nadeau that he was unwilling to do so, given that Danberry had fulfilled its obligations under the listing agreement by obtaining a purchaser who was willing to pay full asking price for the home, and the sale did not close because Nadeau failed to abide by her own obligations under her purchase agreement with the Vidras.

{¶ 13} On February 1, 2018, the Vidras and Danberry, acting as co-plaintiffs, filed a complaint in the Lucas County Court of Common Pleas alleging that Nadeau breached her contractual obligations to them. The Vidras sought specific performance of the purchase agreement—namely, possession of the premises—and Danberry sought payment of its commission in the amount of $295 plus 5.76 percent of the agreed-upon

5.

sale price (as specified in the listing agreement dated September 26, 2017), for a total of $19,873.24 in alleged damages.

{¶ 14} On April 7, 2018, Nadeau answered the complaint and filed a counterclaim against Danberry alleging breach of contract, breach of fiduciary duty, and fraud. Danberry answered Nadeau's counterclaims on May 31, 2018, denying all allegations. The Vidras voluntarily dismissed their claim on September 7, 2018.

{¶ 15} On February 20, 2019, Danberry filed a motion for summary judgment as to its breach-of-contract claim and Nadeau's counterclaims. Danberry argued that under the clear terms of the listing agreement, it was entitled to its commission even though the sale did not occur. Danberry also argued that it was entitled to judgment on Nadeau's counterclaims because it had complied with its obligations under the listing agreement and assisted Nadeau in good faith throughout the entire purchase process. Danberry's motion was supported by Hall's affidavit and attached exhibits, which included the listing agreement, the purchase agreement, and emails between he and Nadeau reflecting her refusal to honor the agreed-upon closing date.

{¶ 16} In her March 8, 2019 opposition, Nadeau argued that her efforts to comply with the purchase agreement were thwarted by Danberry's breach of its fiduciary duties to her. Specifically, she claimed that Hall failed to respond to her requests to renegotiate the closing date, interfered with her purchase of another residence, and acted in his own self-interest. Nadeau also argued that the purchase agreement was rendered void and unenforceable because the closing did not occur. Lastly, Nadeau argued that Danberry

6.

fraudulently created a new listing agreement by changing the date and forging her signature on the commission addendum. This forgery, she argued, rendered both listing agreements unenforceable. In support of her opposition, Nadeau attached her own affidavit and exhibits including the original listing agreement dated September 26, 2017, the listing agreement dated November 2, 2017, and the purchase agreement with the Vidras.

{¶ 17} On May 23, 2019, the trial court granted summary judgment to Danberry on its claim for breach of contract and on each of Nadeau's counterclaims. The trial court determined that Danberry satisfied its obligation to find a buyer and was entitled to its commission at a rate of $295 plus 5.76 percent of the purchase price as stated in the listing agreement dated September 26, 2017. The trial court also awarded summary judgment to Danberry on Nadeau's counterclaims, finding the absence of a genuine issue of material fact. The trial court then conducted a damage assessment hearing on October 3, 2019, and awarded Danberry $19,873.24.

{¶ 18} Nadeau, proceeding pro se, timely appealed and asserts the following errors for our review:

> 1. Trial court erred when it granted motion for summary judgment in favor of appellee despite valid defenses to appellee's claims and genuine issues of material fact.

2. Trial court erred when it granted motion for summary judgment in favor of appellee despite appellant's cross-complaint with triable issues of material fact still in dispute.

3. Trial court erred when it granted motion for summary judgment in favor of appellee despite appellant's opposition to motion for summary judgment and memorandum in opposition which included valid facts and law in appellant's favor.

4. Trial court erred when it granted motion for summary judgment in favor of appellee despite affidavit submitted by appellant which contradicted affidavit submitted by appellee.

## II. Law and Analysis

{¶ 19} We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

8.

{¶ 20} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). In doing so, the moving party must point to some evidence in the record in the form of "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action[.]" Civ.R. 56(C); *Dresher* at 292-293. The burden then shifts to the nonmoving party to provide evidence showing that a genuine issue of material fact does exist. *Dresher* at 293. The failure to satisfy this reciprocal burden warrants judgment against the nonmoving party. *Id.* at 293.

### a. The trial court properly granted summary judgment to Danberry on its complaint against Nadeau

{¶ 21} In her first assignment of error, Nadeau argues that the trial court erred when it granted summary judgment to Danberry on its complaint because she had valid defenses to its breach-of-contract claim. In her third and fourth assignments of error, Nadeau argues that her affidavit, which was submitted in response to Danberry's motion for summary judgment, created genuine issues of material fact and, therefore, the trial court erred by granting summary judgment in Danberry's favor. We will address these assignments of error together.

{¶ 22} To establish a breach of contract claim, the plaintiff must establish "by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted

9.

from that failure." *Blake Homes, Ltd. V. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 77 (6th Dist.).

{¶ 23} Here, Danberry established the following facts in support of its motion for summary judgment through Hall's affidavit and attached exhibits: The parties entered into a listing agreement on September 26, 2017. Although there were some disputes regarding the subsequent "amendments" of that agreement on November 2, 2017, it was undisputed that the parties agreed to the September 26, 2017 listing agreement. Under that contract, Danberry was obligated to seek a purchaser for Nadeau's property that was willing to pay $339,000 "or any other * * * price" that Nadeau accepted in writing. On November 15, 2017, Hall secured an offer from the Vidras to purchase the property for the full asking price. Nadeau accepted the Vidras' offer and the parties entered into a written purchase agreement on November 27, 2017. Nadeau, however, refused to move forward on the agreed-upon closing date because her new house was not ready and, therefore, the sale never closed. Under the listing agreement, Danberry is nonetheless owed a commission in the amount of $295 plus 5.76 percent of the purchase price because Nadeau accepted the Vidras' offer in writing. Danberry satisfied its obligations under the agreement, and Nadeau damaged Danberry by failing to pay the commission that is owed under the September 26, 2017 listing agreement.

{¶ 24} Because Danberry satisfied its initial burden under Civ.R. 56 by setting forth these facts—which satisfy all elements of a breach-of-contract claim under Ohio law—Nadeau was required to bring forth additional evidence to demonstrate a genuine

10.

issue of material fact that precluded summary judgment. Nadeau attempted to do this through an affidavit in which she states that Danberry breached the listing agreement by failing to negotiate a new closing date on her behalf. She also claimed that that she was willing to close on time but the Vidras refused to close on January 16, 2018, as scheduled.

{¶ 25} Nadeau's affidavit, however, simply does not create a *genuine* dispute of material fact because her version of events is belied by all of the other evidence in the record—including her own, prior statements in email correspondence with Hall. That email correspondence—which was attached to Hall's affidavit in support of Danberry's motion for summary judgment—clearly shows that Nadeau was not willing to close on the agreed-upon date because her new house in Dundee was not ready for her yet. The correspondence also shows that Hall repeatedly explained to Nadeau that the January 15 closing date (which was subsequently moved to January 16 by agreement of the parties) could not be moved without the Vidras' consent, and Hall repeatedly asked Nadeau to propose a new closing date that he could bring to the Vidras for consideration—but she did not respond to those requests.

{¶ 26} Given Nadeau's own statements in these emails, she cannot create a question of fact by submitting "[a] self-serving affidavit which baldly contradicts the evidence offered by the moving party." *Huntington Natl. Bank v. Belcher*, 6th Dist. Wood No. WD-11-055, 2012-Ohio-3731, ¶ 13. That is, Nadeau's mere denial of the

11.

clear evidence that was introduced through Hall's affidavit is insufficient to create a question of fact regarding her breach of the listing agreement.

{¶ 27} Nadeau also argues that summary judgment should not have been awarded to Danberry because she has valid defenses to Danberry's breach-of-contract claim. That is, on appeal, Nadeau claims that the listing agreement violates Ohio's Statute of Frauds, and that her performance under the listing agreement was excused because Danberry allegedly violated various provisions of the Ohio Revised Code—namely R.C. 1303.04, 1303.50, 1345.03, and 4735.18.

{¶ 28} Initially, we note that Nadeau did not allege any affirmative defenses in her answer and failed to argue the alleged statutory violations in the trial court. "It is a cardinal rule of appellate review that a party cannot assert new legal arguments for the first time on appeal." *Murray v. Auto-Owners Ins. Co.*, 2015-Ohio-3295, 40 N.E.3d 679, ¶ 26 (6th Dist.), citing *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). Nadeau has therefore waived those defenses for purposes of appeal. *Id.* Regardless, Nadeau's arguments fail as a matter of law.

{¶ 29} The listing agreement is not governed by Ohio's Statute of Frauds, which is codified at R.C. 1335.05. "[A] listing agreement is essentially an employment contract for professional services and does not constitute a contract for the sale or transfer of real estate as contemplated by the Statute of Frauds." *Crilow v. Wright*, 5th Dist. No. 10 CA 10, 2011-Ohio-159, ¶ 36.

12.

{¶ 30} Similarly, R.C. 1303.04 and 1303.50 apply to negotiable instruments, which are defined as "an unconditional promise or order to pay a fixed amount of money[.]" R.C. 1303.03. The listing agreement is a bilateral contract; not a negotiable instrument. Thus, R.C. 1303.04 and 1303.50 are inapplicable.

{¶ 31} Nadeau also relies upon R.C. 1345.03, which is part of Ohio's Consumer Sales Practices Act ("CSPA") and prohibits suppliers from committing an "unconscionable act" in connection with a "consumer transaction." Even if we assume for purposes of analysis that the CSPA applies to the listing agreement between Nadeau and Danberry, there are no facts in the record to demonstrate that Danberry committed an "unconscionable act." Indeed, Nadeau's argument is premised upon a mischaracterization of the contract itself. That is, Nadeau argues that the listing agreement was "one-sided" because Danberry "only need secure an offer at which time they are entitled to full commission," and Danberry deceptively claimed to be entitled to commission even though commission was to be paid "on the sale of a home." To the contrary, the listing agreement clearly states that Danberry earned its commission if "an offer is obtained which Owner accepts in writing"—which Nadeau did.

{¶ 32} Finally, Nadeau argues that Hall was purportedly disciplined under R.C. 4735.18 for changing the status of her property from "contingent" to "back on the market (active)" on July 8, 2018, even though the listing agreement had expired on May 2, 2018. There is no evidence in the record to support this allegation. But, even if true, such conduct by Danberry—which is alleged to have occurred five months after Nadeau

13.

refused to close on the property in January 2018—would not "excuse" Nadeau's prior breach of the listing agreement.

{¶ 33} For all these reasons, the trial court did not err in granting summary judgment to Danberry on its breach-of-contract claim against Nadeau. We therefore find Nadeau's first, third, and fourth assignments of error not well-taken.

### b. The trial court properly granted summary judgment to Danberry on Nadeau's counterclaims

{¶ 34} In her second assignment of error, Nadeau argues that the trial court erred in granting summary judgment to Danberry on her counterclaims for breach of contract, breach of fiduciary duty, and fraud.

{¶ 35} First, regarding her counterclaim for breach of contract, we have already determined that Danberry satisfied its obligations to Nadeau under the listing agreement, and Nadeau failed to honor her obligation to pay Danberry's commission under that agreement. Thus, the trial court did not err by granting summary judgment to Danberry on Nadeau's counterclaim for breach of contract.

{¶ 36} Second, regarding Nadeau's counterclaim for breach of fiduciary duty, it is true that Danberry owed Nadeau the fiduciary duties that are outlined in R.C. 4735.62 as well as the common law fiduciary duties of a broker-client relationship, which include disclosure, good faith, and loyalty. *Whaley v. Zyndorf/Serchuk, Inc.*, 6th Dist. Lucas No. L-01-1295, 2002-Ohio-2640, ¶ 8. Nadeau claims that she was misled and repeatedly ignored by Hall—in breach of his fiduciary duties to her— which resulted in the sale of

14.

her property falling through. This allegation, however, is merely a self-serving denial of the clear evidence that Danberry introduced—which demonstrates that Hall accurately explained to Nadeau that she was contractually obligated to honor the agreed-upon closing date (and corresponding relinquishment of possession to the Vidras), but that he would be willing to seek the Vidras' agreement to move the closing date if she would propose an alternative date. Nadeau never proposed an alternative date, despite repeated requests from Hall. Nadeau's unsupported statements that she was "misled" and "ignored" by Hall are therefore insufficient to show a genuine issue of material fact. *Belcher*, 6th Dist. Wood No. WD-11-055, 2012-Ohio-3731, at ¶ 13.

{¶ 37} Nadeau also alleges that Danberry breached its fiduciary duties when Hall "sabotaged" the purchase of her new home in Dundee, Michigan by disclosing confidential information to the listing agent for that property. Nadeau does not specify what information was allegedly disclosed or how its disclosure precluded her purchase of the other property. As the trial court noted, Nadeau's bald statement—without any other evidentiary support—is insufficient to create a genuine issue of fact. *Belcher* at ¶ 13. We therefore find that the trial court did not err in awarding summary judgment to Danberry on Nadeau's counterclaim for breach of fiduciary duty.

{¶ 38} Finally, Nadeau argues that the trial court erred in granting summary judgment to Danberry on her fraud counterclaim. To establish a claim for fraud, a plaintiff must demonstrate (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction, (3) made falsely, with

15.

knowledge of its falsity, or with such utter disregard and recklessness as to its truth or falsity that knowledge may be inferred, (4) with the intent of misleading another to rely on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991).

{¶ 39} Nadeau argues that Danberry committed fraud by changing the date of the listing agreement from September 26, 2017, to November 2, 2017, and by forging her signature on the commission addendum to the November 2, 2017 agreement. First, the date of the listing agreement is immaterial—indeed, the terms of the September 26, 2017 listing agreement and November 2, 2017 listing agreement are otherwise identical—and Nadeau fails to explain how she relied upon the allegedly-falsified date to her detriment. Second, Danberry sought to recover commission in the amount of $295 plus 5.76 percent of the purchase price—as specified in the September 26, 2017 listing agreement—rather than any additional commission that may have been owed under the November 2, 2017 addendum. And, the trial court awarded damages according to the commission that is owed under the September 26, 2017 listing agreement—which Nadeau does not dispute that she signed. Thus, even if we assume that Danberry surreptitiously changed the date of the listing agreement to November 2, 2017 and also forged her signature on the November 2, 2017 addendum (which it did not seek to enforce), Nadeau is unable to show that she suffered any damages as a result. We therefore find that the trial court did not err in granting Danberry summary judgment on Nadeau's counterclaim for fraud.

16.

{¶ 40} For all of these reasons, the trial court properly granted summary judgment to Danberry on Nadeau's counterclaims, and Nadeau's second assignment of error is found not well-taken.

### III. Conclusion

{¶ 41} In conclusion, we find Nadeau's assignments of error not well-taken. The trial court properly awarded summary judgment to Danberry on its complaint and Nadeau's counterclaims against it. The October 4, 2019 judgment of the Lucas County Court of Common Pleas is affirmed. Nadeau is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.